In the Matter of the **WELLINGTON CONSTRUCTION CORPORATION, Debtor.**

**Jacob C. PONGETTI, Trustee for the Estate of the Wellington Construction Corporation, Plaintiff,**

v.

**MERCHANTS AND FARMERS BANK, Defendant.**

Bankruptcy No. S82–10052.
Adv. No. 84–1048.

United States Bankruptcy Court, N.D. Mississippi.

March 13, 1987.

Pat Scanlon, Young, Scanlon & Sessums, Jackson, Miss. and Dewitt Hicks, and Gordon Flowers, Gholson, Hicks & Nichols, Columbus, Miss., for Merchants and Farmers Bank.

## OPINION

DAVID W. HOUSTON, III,
Bankruptcy Judge.

This cause came on for hearing as a result of the third amended complaint filed by the plaintiff, Jacob C. Pongetti, Trustee for the Estate of the Wellington Construction Corporation, hereinafter referred to as plaintiff or trustee; an answer and counterclaim having been filed by the defendant, Merchants and Farmers Bank, hereinafter referred to as defendant or bank; all parties being represented before the Court by their respective attorneys of record; and the Court having heard and considered same, hereby finds as follows, to-wit:

### I.

The Court has jurisdiction of the subject matter of and the parties to this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(F) and (H).

### II.

The trustee's third amended complaint attempts to recover, for the benefit of the bankruptcy estate, five transactions or transfers as fraudulent conveyances or voidable preferences. These five transfers are identified as follows, to-wit:

1. The execution of a deed of trust, dated June 23, 1981, encumbering the Columbus Canterbury Apartments.

2. The execution of a deed of trust, dated June 23, 1981, encumbering a lot located on Fifth Street North, Columbus, Mississippi.

3. The setoff of four bank accounts, maintained by Wellington Construction Corporation at the defendant bank, on November 16, 1981, totaling the sum of $589.97.

Joe O. Sams, Jr., Sams & Kessler, Columbus, Miss., for Jacob C. Pongetti.

4. The setoff of a certificate of deposit, owned by Wellington Construction Corporation, on November 16, 1981, in the sum of $17,947.43.

5. The execution of a deed of trust, dated November 16, 1981, encumbering the Starkville Canterbury Apartments.

By virtue of a partial judgment, dated December 22, 1986, and entered December 23, 1986, the Court decided that the transactions involving the Columbus Canterbury Apartments and the lot located on Fifth Street North, Columbus, Mississippi (transactions No. 1 and No. 2 hereinabove), were not recoverable by the trustee as fraudulent conveyances or preferential transfers. The aforesaid partial judgment is incorporated herein by reference.

As to the Columbus Canterbury Apartments, the Court found that this property was not actually owned by Wellington Construction Corporation, hereinafter referred to as Wellington, but rather by several individuals. The Court also found that there was no insider relationship between Wellington and the defendant bank as that term is defined in 11 U.S.C. § 101(28)(B). Both of the transactions occurred beyond the ninety day preference period as set forth in 11 U.S.C. § 547(b)(4)(A), and absent the "insider" relationship, neither transaction could be set aside as a preferential transfer. The Court also found that neither of these transactions could be set aside as fraudulent conveyances in that the Bankruptcy Code specifically permits the securing of an antecedent debt. Note the interaction of 11 U.S.C. § 548(a)(2)(A) and 11 U.S.C. § 548(d)(2)(A). There was no evidence whatsoever that the transactions were undertaken with an actual intent to hinder, delay, or defraud anyone as contemplated in 11 U.S.C. § 548(a)(1). Therefore, the trustee's third amended complaint was dismissed as to these two transactions, all as set forth in the aforementioned partial judgment.

### III.

The deed of trust, dated November 16, 1981, encumbering the Starkville Canterbury Apartments, as noted in transaction No. 5 hereinabove, was subsequently foreclosed. Prior to the hearing, there was a dispute between the plaintiff trustee and the defendant bank as to the value realized by the bank from the foreclosure sale. As set forth in paragraph 9(1) of the pre-trial order, entered in this proceeding, the bank contended that it received $15,779.40 from the foreclosure, while the trustee contended that the bank received $26,041.00. At the hearing, it became apparent that the trustee had not taken into account certain costs and expenses related to the foreclosure. Following a deduction of that portion of the costs related to the bank's interest in the collateral, the bank's initial calculation was found to be correct, i.e., $15,779.40.

On the final day of the hearing, the bank introduced appraisal testimony, without objection, to the effect that it actually received nothing as a result of the foreclosure sale. In closing argument, counsel for the bank explained to the Court that the 12 units of the apartment complex, pledged to the defendant bank, could be separately identified, rather than being considered only as a percentage of the total 82 units in the complex. The 12 units were encumbered by a deed of trust in favor of First Federal Savings and Loan Association of Columbus, securing an original indebtedness of $240,000.00, which was superior to the lien of the defendant bank. Through an affidavit, which was not admitted into evidence at the hearing, the bank now contends that First Federal received the sum of $231,829.27 from the foreclosure sale. Further, if a proration of the foreclosure costs were added to this sum in the amount of $9,989.57, (12/82nds of $68,262.08, the total foreclosure costs), the appraised value of the property, in the sum of $240,000.00, was exceeded by the total payment to the first lien holder and the prorated foreclosure costs. ($231,829.27 plus $9,989.57) As such, the defendant bank takes the position that it received nothing from the foreclosure sale.

The defendant initially calculated its proceeds received from the sale on Exhibit

D–16, which is summarized as follows, to-wit:

$15,779.40 RECEIVED BY BANK ON
10–29–82 FROM SALE OF 12 UNITS OF 82
UNITS OF STARKVILLE CANTERBURY APARTMENTS

| Net Sales Price: (Following the deduction of $68,262.08 as foreclosure cost) | $107,826.01 |
|---|---|
| Divided by 82 total units equals | 1,314.95 per unit |
| Times 12 units collateralized to defendant bank equals | $ 15,779.40 |

■ The hearing must be conducted in conformity with the pretrial order, which was executed by both parties, and entered by the Court. Throughout the pretrial order, the defendant bank contended that it had received the sum of $15,799.40 as a result of the Starkville Canterbury Apartments foreclosure. See the defendant's statement of facts, paragraph 7, page 6; the contested issues of fact, paragraph 9(1), page 12; and defendant's Exhibit D–16, paragraph 11(B), page 19. The provisions of the pretrial order cannot be amended at this time to accommodate the theory, which arose practically as an afterthought, that the bank received nothing as a result of the foreclosure. Therefore, for purposes of this opinion, the Court is constrained to consider that the defendant bank received the sum of $15,799.40 as foreclosure proceeds. The trustee had little opportunity to comprehend, much less to rebut, this lately developed theory.

### IV.

■ The setoff of the bank accounts, the setoff of the certificate of deposit, and the execution of the Starkville Canterbury Apartments deed of trust, all occurred within the ninety day preference period prior to the filing of the petition in bankruptcy. The involuntary petition was filed on February 4, 1982, so the ninety day preference period commenced on November 6, 1981. At this point, the Court is concerned only with whether these three transactions might be avoided by the trustee pursuant to 11 U.S.C. § 547(b), as preferential transfers. These three transactions are not fraudulent conveyances, as contemplated under 11 U.S.C. § 548(a)(1) or (2), for the same reasons that were stated hereinabove when transactions No. 1 and No. 2 were discussed. For reference purposes, the text of 11 U.S.C. § 547(b) is set forth as follows:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider;

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

(All further references in this opinion to United States Code sections shall be considered as Title 11, United States Code, unless specifically noted otherwise.)

### V.

■ The next area of inquiry that will be addressed is whether or not Wellington was insolvent when the three transfers occurred. As set forth in § 547(f), the debtor is presumed to have been insolvent on or within the ninety days immediately preceeding the date of the filing of the bankruptcy petition. This is a rebuttable presumption, however, that exists in favor of the trustee, which can be overcome by the presentation of credible evidence. In an effort to overcome the presumption in this case, the defendant bank offered the testimony of Charles Bland and William K. Blair, both former officers of Wellington,

who stated that in their opinion Wellington was not insolvent on November 16, 1981. These conclusory statements were not supported by any financial statements or records. The Court has no remote idea as to the value of assets owned by Wellington at the time of the transfers. However, the substantial amount of debt owed by Wellington, as well as the significant overdrafts that occurred periodically in the Wellington bank accounts were clearly proven by the evidence. The Court is, therefore, of the opinion that the presumption of insolvency was not successfully rebutted by the generalized "in court" statements of Bland and Blair.

### VI.

■ The three transfers, made on November 16, 1981, were only parts of a comprehensive settlement agreement entered into by and between Wellington Construction Corporation, Bland Construction Company, Inc., Charles B. Bland, Jr., and W.K. Blair, referred to therein as borrowers, with the defendant bank. *See,* Exhibit P–27. The "bottom line" of the settlement agreement provided for the execution of a master promissory note in favor of the bank in the total sum of $397,542.19. *See,* Exhibit D–10. There were two advances made under this note. The first, in the sum of $249,054.19, was advanced on November 16, 1981 (Exhibit D–11(a)), and according to the post-trial memorandum filed by counsel for the defendant bank, was applied as follows, to-wit:

| | |
|---|---|
| Overdrafts of Bland Construction Company bank accounts | $175,082.27 |
| Interest payments on Wellington Note Nos. 7167, 9094, 9096, and 9115 (Exhibits D–1, P–15, P–16, and D–7, respectively) | 28,223.98 |
| Attorneys fees and bond premium in Bank's suit against Wellington (Exhibit D–9) as approved in Settlement Agreement (Exhibit P–27) | 34,500.00 |
| Interest on note from four individuals, Note No. 9095 (Exhibit P–14) | 11,247.94 |
| | $249,054.19 |

The second advance, in the sum of $47,610.00, occurred on November 24, 1981, and was apparently credited to offset overdrafts in the Bland Construction Company accounts, although no proof was offered to verify this assumption. *See,* Exhibit D–12(a). This second advance was the amount actually disbursed on a contingent line item in the settlement agreement that had been established to cover disputed uncollected checks. The total contingent sum was initially set at $148,488.00 and represented the difference in the master promissory note and the initial $249,054.19 advance ($397,542.19 − $249,054.19 = $148,488.00). As noted hereinabove, from the two advances Wellington received the benefit, as the bank contends, of $28,223.98, representing interest payments on four Wellington notes, and $34,500.00, representing the attorney's fees and bond premium incurred as a result of the bank's suit against Wellington and several others. These two figures total the sum of $62,723.98. The bank contends that since this amount exceeds the value of transfers Nos. 3, 4, and 5, that the trustee may not avoid these transfers inasmuch as they were made as a contemporaneous exchange for new value given to the debtor, Wellington, as contemplated under § 547(c)(1). The bank also contends that since the subsequent advance on November 24, 1981, in the sum of $47,610.00, exceeds the value of the three transfers, that the "net result" rule of § 547(c)(4) precludes avoidance of the transfers by the trustee because the defendant later advanced "new value to or for the benefit of the debtor", which can be offset against any claimed preferences. Before addressing these two defenses, the Court must first address the remaining provisions of § 547(b).

It has already been established that the presumption of insolvency was not overcome by the defendant's proof and that the transfers occurred on or within ninety days before the date of the filing of the bankruptcy petition. There is no question that the transfers involved interests of the debtor in property, transferred to or for the benefit of a creditor. As set forth earlier, the funds advanced, in the total sum of $62,723.98, allegedly attributable to the benefit of Wellington, were applied to interest that had accrued on four Wellington notes, as well as the attorney's fees and bond premium that were incurred by the

bank in prosecuting the lawsuit against Wellington and others. The Court does not feel that the entire amount of attorney's fees and bond premium should be assessed exclusively against Wellington, but fortunately, the resolution of this ancillary issue is not necessary to decide the ultimate issues in this case. Regardless of the fact that Wellington executed a new master note in the sum of $397,542.19 on November 16, 1981, and at the same time permitted the setoff of its bank accounts and the certificate of deposit, in addition to pledging its interest in the Starkville Canterbury Apartments, the actual note proceeds allocated to Wellington were applied to antecedent debts, i.e., the previous interest accruals, the attorney's fees, and the bond premium. Consequently, the transfers were for or on account of antecedent debts owed by the debtor before such transfers occurred, which satisfies element (2) of § 547(b).

Transfers to pay on or secure antecedent debts, made within the ninety day preference period, obviously permit the creditor, the defendant bank, in this case to receive more than said bank would receive if the case were a Chapter 7 liquidation proceeding.

Therefore, all the requisite elements of § 547(b) have been established by the evidence presented.

### VII.

■ The final questions to be resolved concern whether the trustee is prohibited from avoiding the three transfers because of the "contemporaneous exchange" rule set forth in § 547(c)(1), or the exception to avoidance found in § 547(c)(4).

The "contemporaneous exchange" exception to preference avoidance, which will be considered first, provides, inter alia, that the trustee may not avoid a transfer "to the extent that: such transfer was intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor, and; in fact was a substantially contemporaneous exchange." As set forth hereinabove, although Wellington executed a new note, on November 16, 1981, the proceeds were allocated exclusively to antecedent debts. Succinctly stated, there was simply no *new* value given to the debtor Wellington. All three of the transfers were applied to obligations that Wellington already owed to the bank, and as such, the "contemporaneous exchange" rule cannot be utilized by the defendant to preclude the trustee's avoidance action.

The implementation of the settlement agreement has the same effect as if Wellington, within the ninety day preference period, renewed a previously *unsecured* debt through the execution of a renewal promissory note, and secured this renewal note with previously unencumbered collateral. This presents a classic preference case.

§ 547(c)(4) states, inter alia, that a trustee may not avoid a transfer "to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor ..." In its post-trial memorandum, the defendant bank attempts to invoke what it labels as the "net result" rule regarding the $47,610.00 advanced on November 24, 1981. Since this advance exceeds the total amount of the three transfers, i.e., $34,-316.80, the bank states that this advance should be offset against the transfers as a "washout".

Actually, there is no "net result" rule found in § 547(c)(4), but rather a "subsequent advance" rule. *See, In Re American International Airways, Inc.*, 56 B.R. 551 (Bankr.E.D.Pa.1986); *Leathers v. Prime Leather Finishes Co.*, 40 B.R. 248 (D.Me.1984); *Matter of Isis Foods, Inc.*, 39 B.R. 645 (W.D.Mo.1984); *In re Wadsworth Bldg. Components, Inc.*, 711 F.2d 122 (9th Cir.1983); and *Matter of Bishop*, 17 B.R. 180 (Bankr.N.D.Ga.1982). § 547(c)(4) should not be confused with the "netting" effect of § 547(c)(5), which applies exclusively to inventory, receivables, or the proceeds thereof. *See, Matter of Missionary Baptist Foundation, Inc.*, 796 F.2d 752 (5th Cir.1986). Regardless, because of the facts of this case, the mechanical applica-

tion of a "net result" rule as opposed to a "subsequent advance" rule is immaterial.

■ The burden of proof to establish an exception to the trustee's avoidance powers lies upon the affected creditor. The defendant bank candidly admits that there was no proof whatsoever concerning the application of the $47,610.00 advance, but continues by stating that even if these funds were advanced to cover overdrafts in the Bland Construction Company bank accounts, maintained at the defendant bank, that the so called "net result" rule still applies inasmuch as Wellington could be considered as receiving some indirect benefit. The Court can simply not accept this argument. There was no proof of any description that the defendant bank gave *new value to or for the benefit of Wellington,* and as such, § 547(c)(4) cannot be utilized as an effective defense by the bank in this case.

### VIII.

In view of the fact that the defendant bank has failed to establish any exception under § 547(c), to the trustee's avoidance powers granted under § 547(b), as well as, that all of the tests of § 547(b) have been met regarding the setoff of the bank accounts, the setoff of the certificate of deposit, and the execution of the deed of trust encumbering the Starkville Canterbury Apartments, the trustee may avoid these three transfers as preferences in the total sum of $34,316.80. Since the values of the three transfers are liquidated amounts, the trustee shall be awarded judgment against the defendant, Merchants and Farmers Bank, in the sum of $34,316.80, with interest to accrue from and after the date of the order awarding said judgment according to law.

An order will be entered consistent with this opinion.