In the Matter of Blair C. BISHOP, Debtor.

Harry W. PETTIGREW, as Trustee in Bankruptcy of the Estate of Blair C. Bishop, Trustee,

v.

TRUST COMPANY BANK, Defendant.

Bankruptcy No. 80–0168A.

United States Bankruptcy Court, N. D. Georgia.

Jan. 11, 1982.

Harry W. Pettigrew, Atlanta, Ga., for trustee.

King & Spalding, Atlanta, Ga., for defendant.

## OPINION

WILLIAM L. NORTON, Jr., Bankruptcy Judge.

Blair C. Bishop, the debtor ("Bishop") filed a voluntary petition under Chapter 7 of the U.S. Bankruptcy Code on December 21, 1979. Until that time, Bishop conducted a steel-building construction business through a sole proprietorship known as Bishop & Associates.

Beginning in 1976, Bishop borrowed working capital and operational funds from the Peachtree Industrial Branch of Trust Company Bank ("Trust Company"). Bishop borrowed business funds, in amounts up to twenty thousand dollars, on an unsecured, short-term basis.

During the six months preceding this filing, Bishop received a number of unsecured loans from Trust Company. Trust Company had in its possession, prior to the grant-ing of these loans, proprietorship and personal financial statements dated March 31, 1979, reflecting company and personal net worth in excess of $150,000.00 and $100,000.00 respectively. Also, Trust Company had a June 29, 1979 letter from Bishop accompanying certain financial statements which predicted a strong profit showing for the remainder of the 1979 calendar year. Trust Company did not have a financial statement from Bishop covering the second quarter of 1979.

Beginning on July 27, 1979, Trust Company extended credit to Bishop on five occasions prior to Bishop's bankruptcy filing. Additionally, during this period Bishop made four loan payments to Trust Company. These transactions are summarized below.

| Loans | Payments |
|---|---|
| 1. July 27, 1979: $18,000 note | |
| 2. August 29, 1979: $6,568.88 note | |
| | 3. September 21, 1979: $6,627.59 payment for August 29 note |

September 22, 1979 Preference Period . . . . . . . . . . . . .

| Loans | Payments |
|---|---|
| | 4. September 27, 1979: $18,418.50 payment for July 27 note |
| 5. October 3, 1979: $9,140.80 note | |
| 6. October 4, 1979: $19,300 note | |
| 7. November 21, 1979: $10,000 note | |
| | 8. November 28, 1979: $1,828.16 paid on October 3 note |
| | 9. December 4, 1979: $19,800 paid on October 4 note |

December 21, 1979, Debtor filed Chapter 7 Petition.

## TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

The trustee for the estate of Bishop alleges that this court should hold as a matter of law that the three payments made during the preference period commencing on September 22, 1979 and ending on December 21, 1979 should be avoided as preferences. For a preference to be avoided under 11 U.S.C. § 547(b) of the Bankruptcy Code, all of five elements must be

present. *In re Kelly,* 3 B.R. 651, 6 B.C.D. 395; 2 C.B.C.2d 15 (Bkrtcy.E.D.Tenn.1980). Section 547(b) provides that "Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title."

The parties to this action agree that (1), (2), (4) and (5) of § 547(b) have been shown. However, there is disagreement as to whether Bishop was insolvent on the dates of the transfers. The evidence offered to show Bishop's insolvency is contained in an affidavit submitted by the trustee. The trustee, after a review of Bishop's personal and business records maintains that Bishop was insolvent on both November 28, 1979 and December 4, 1979. In his testimony, the trustee states that Bishop had assets on November 30, 1979 totalling $239,196.60. After the subtraction of exemptions, Bishop's assets totalled $224,218.44. Bishop's liabilities on that date totalled $277,699.97. On December 4, 1979 the aggregate value of his assets was $220,778.52. After subtracting Bishop's claim of exemptions, his assets totalled $207,278.52. The aggregate value of the liabilities as of December 4, 1979 was $271,349.63.

Under the Bankruptcy Code, when insolvency is in issue, it is determined by a "balance sheet" test. A debtor is insolvent when his liabilities exceed his assets. 11 U.S.C. § 101(26). If the court were to rely solely on the trustee's affidavit of the financial condition of Bishop, the debtor would be deemed insolvent during the preference period which would allow the recovery by the trustee of the September 27, November 28 and December 4 payments.

Bankruptcy Rule 756 makes Rule 56 of the Federal Rules of Civil Procedure applicable in adversary proceedings. In a motion for summary judgment, the movant must comply with Rule 56(e) when presenting affidavits. Rule 56(e) says in part "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Further, Rule 56(e) requires that "sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." The trustee bases his motion for summary judgment on his own affidavit only. The trustee relies on *In re National Buy-Rite, Inc.,* 7 B.R. 407, 3 C.B.C.2d 431 (Bkrtcy.N.D.Ga., 1980) which held that such an affidavit can be the basis of a summary judgment motion. In *National Buy-Rite,* the court did grant the movant's summary judgment motion supported only by the trustee's own affidavit concerning the debtor's insolvency. However, the court stated that had the defendant made a motion to strike the affidavit, the summary judgment would not have been granted. It would not have been granted because the testimony supplied by the trustee's affidavit would have been subject to an objection on the grounds that the affidavit was hearsay. *National Buy-Rite,* 7 B.R. 407, 3 C.B.C. at 434. As Rule 56(e) provides "If he [the opposing party] does not so respond, summary judgment, if appropriate, shall be entered against him."

*National Buy-Rite* is not controlling in this action because Trust Company responded to the trustee's affidavit with a motion to strike that affidavit. The affidavit, based on written, out of court statements, is subject to a hearsay objection. Therefore, there still remains the factual question of

whether the debtor was insolvent ninety (90) days before his bankruptcy petition was filed. Summary judgment shall only be rendered if "there is no genuine issue as to any material fact." Rule 56(c).

■ This court finds that issues of fact have been sufficiently raised and that the trustee's own affidavit, supported only by what was told to him and his surmisals, is not enough for this court to hold as a matter of law that Bishop was insolvent on the dates in question.

## TRUST COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Trust Company has moved for dismissal of Count III of the Amended Complaint which seeks to avoid as a preference a payment made on September 27, 1979 of $18,-418.50. This payment was made on the July 27, 1979 note.

Section 547(b) provides that "Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—the section that is applicable in this instance is 11 U.S.C. § 547(c)(4). Section 547(c)(4) provides:

"(c) the trustee may not avoid under this section a transfer—

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor; . . . ."

Trust Company claims that the September 27, 1979 payment of $18,418.50 should be set off against the subsequent credit extensions.

■ For § 547(c)(4) to apply, three requirements must be met. First, the creditor must extend new value as defined in § 547(a)(2) as "money or . . . new credit"

after the challenged payment. The payment which is the subject of Count III of the Amended Complaint was made on September 27, 1979. Following that date, Trust Company made three further credit extensions to Bishop on October 3rd, October 4th and November 21st. Therefore, "new value" as defined in § 547(a)(2) was extended after the payment. Secondly, the new value must be unsecured. Section 547(c)(4)(A). The parties agree that the new value was unsecured. Finally, the new value must go unpaid. Section 547(c)(4)(B). In this case the new value given by Trust Company October 3, October 4, and November 21, 1979 amounted to $38,440.80. Of this amount $21,628.16 was repaid: $1,828.16 (October 3 note) on November 28, 1979 and $19,800.00 (October 4 note) on December 4, 1979. The extent to which the new value went unpaid is $16,812.64. To this extent the payment of September 27, 1979, if found preferential, may be offset.

Having satisfied these three requirements, the September 27, 1979 payment is protected by § 547(c)(4). Trust Company is entitled to a partial summary judgment on Count III to the extent of $16,812.64.

Finally, Trust Company seeks to have this court make a determination that as a matter of law the trustee can recover under his complaint no more than $1,605.86 which is the amount received by Trust Company in excess of new loans advanced by the bank during the 90 day preference period.

Trust Company asserts that although the November 28 and December 4 payments received by it are not within the express terms of § 547, their receipt is instead protected by the judicially-developed "net result" rule which operates independently of § 547(c)(4). This rule had its genesis in *Jaquith v. Alden*, 189 U.S. 78, 23 S.Ct. 649, 47 L.Ed. 717 (1903) and *Yaple v. Dahl-Millikan Grocery Co.*, 193 U.S. 526, 24 S.Ct. 552, 48 L.Ed. 776 (1904) and was followed by the Fifth Circuit in *Walker v. Wilkinson*, 296 F. 850 (5th Cir. 1924).[1] The effect of the net

---

1. Fifth Circuit precedent has been adopted as precedent for the Eleventh Circuit. *Bonner v.* *City of Prichard*, 661 F.2d 1206 (11th Cir., 1981).

result rule is to net all new value loans with payments that occur during the preference period. This contrasts with the subsequent advance rule of § 547(c)(4) which allows only the new value extended subsequent to the otherwise preferential payment to be netted.

The Fifth Circuit's application of the net result rule was based on the Bankruptcy Court's equitable power and the determination that the right to set off under former § 60(c) was non exclusive. While the courts held that § 60(c) was nonexclusive, it appears that Code § 547(c)(4) is exclusive and for a creditor to thwart a trustee's recovery of a preference the creditor must come within the bounds of § 547(c).

There is a dearth of commentary as to the vitality of the net result rule under the Code. *Collier on Bankruptcy* provides the following:

> Thus, under prior law, the "net result rule" depended more on the creditor's belief in the debtor's solvency than it did on any rationalization as to enrichment of the debtor's estate. The Code makes no such distinction. Rather, it simply gives the transferee credit to the extent that subsequent new value is given on an unsecured basis or is secured by an avoidable security interest. 4 *Collier on Bankruptcy* ¶ 547.40.

*Norton Bankruptcy Law and Practice* while not going so far as to negate the vitality of the rule expresses substantial doubt:

> "[N]et result rule," an analytical approach that considers all payments and extnesions of credit received during the period applicable to preference law and permits recovery of only the net gain received by the creditor. This rule was applied in cases at the beginning of the 20th century, but is of doubtful current validity. 2 *Norton Bankr. L. & Prac.* § 32.20.

The trustee contends that the net result rule has no application under the Bankruptcy Code. He argues that the new value exception to preferences is governed by § 547(c)(4) which is clear and unequivocal on its face. This court is inclined to agree. The language of subsection (c)(4) "to the extent that, *after* such transfer, such creditor gave new value to or for the benefit of the debtor . . . ." [emphasis supplied] flies in the face of the net result rule which would allow new value given *before* a preferential payment to effect the preferential payment. The legislative history relevant to § 547(c)(4) muddles what is otherwise the clear statutory intent. The House Report states:

> The fourth exception codifies the net result rule in section 60c of current law. If the creditor and the debtor have more than one exchange during the 90-day period, the exchanges are netted out according to the formula in paragraph (4). Any new value, that the creditor advances must be unsecured in order for it to qualify under this exception.

H.R.Rep.No.95–595, 95th Cong., 1st Sess. 374 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6330. The Senate Report on § 547(c)(4) is identical. S.Rep.No.95–989, 95th Cong., 2nd Sess. 88, (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5874.

The first sentence of the comment seems to construe extended life for the net result rule. Yet, this possible extension is then stymied by the second sentence which provides that "the exchanges are netted out *according to the formula in paragraph* (4)." [Emphasis supplied.] The formula in paragraph (4) specifies that new value given *after the preferential transfer*, to the extent that it [new value] goes unpaid is netted. In this case no new value was given after the payments of November 28 and December 4, 1979.

While the House and Senate Reports are ambiguous, the Bankruptcy Commission Report regarding the net result rule is clear:

> The Commission's recommendation does not, however, go as far as the "net result rule" established by some early cases. A true "net result" rule would total all payments and all advances and offset the one against the other. This is not allowed under the Commission's recommendation, since the advance to be

offset must be subsequent to the preference. Report of the Commission on the Bankruptcy Laws of the United States, H.Doc.No.93–137, 93rd Cong., 1st Sess., Pt. I, 210–211, (1973).

Courts, in the past, have justified the use of the net result rule relying on the equities of the case. Equity was served by allowing all transactions during the preference period to be netted because the estate was enriched by the giving of new value. If the net result enriched the estate there was no preference. This view encompasses only the parties to the preferential transactions, the debtor (his estate) and the preferred creditor. From the vantage of these parties the effect of the transactions to the estate is that any diminution is replaced to the extent of new funds advanced by the otherwise preferred creditor. Viewed from the position of a creditor who has not received a preferential payment and who gave new value during the preference period, the equities of the net result rule are not apparent.

██ Having reviewed the decisions,[2] the Code and the legislative history it is the opinion of this court that the net result rule has no application under § 547(c)(4) of the Code and that this court may not grant summary judgment for Trust Company limiting the amount recoverable by the Trustee to $1,605.86, which is the amount received by Trust Company in excess of new loans advanced by Trust Company during the 90 day preference period.

Pursuant to Rule 921(a) the court will enter a separate order in accordance with the above opinion.

2. To this time there has been only one Code case dealing with the net result rule. *In re Fulghum Const. Corp.*, 7 B.R. 629, (Bkrtcy.D.C. M.D.Tenn.1980) aff'd. 14 B.R. 293 (D.C.M.D. Tenn.1981). In this case the Bankruptcy Court and the District Court concluded that the net result rule has continued vitality under the Code. The case dealt with § 547(b)(5) but states that § 547(c)(1) was intended to codify "the net result rule in Section 60c of current law." Neither the Bankruptcy Court nor the District Court included the next sentence in the House and Senate Reports which indicates that the transactions are to be netted in accordance with the formula in § 547(c)(4) which is very different from the judically created net result rule.